**Dana BRUCE, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 02–CF–97.

District of Columbia Court of Appeals.

Argued March 5, 2003.
Decided April 3, 2003.

Sydney J. Hoffmann, for appellant.

Jessie K. Liu, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Elizabeth Trosman, and Margaret Carroll, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge and FARRELL and WASHINGTON, Associate Judges.

WASHINGTON, Associate Judge:

Appellant, Dana Bruce, was convicted of armed robbery, in violation of D.C.Code §§ 22–2901, –3202 (1996), currently D.C.Code §§ 22–2801, –4502(2001) and possession of a firearm during a crime of violence, in violation of D.C.Code § 22–3204(b) (1996), currently D.C.Code § 22–

4504(b)(2001). Dana[1] appeals his conviction and contends that the trial court abused its discretion in precluding a defense that Dana's brother, Dale Bruce committed the offenses. We disagree and affirm the trial court's ruling.

## I.

On the evening of December 3, 2000, a man with a gun, later identified as Dana Bruce, entered a Popeye's restaurant at 651 Florida Avenue, N.W., Washington, D.C. There were five employees on duty that night, three of whom were at or near the front counter. When Dana approached the counter, he pointed the gun at one of the cashiers, Elizabeth Tassen, and ordered her to give him the money in the register. Ms. Tassen, who had poor English skills, tugged on the blouse of Jupiter Niles, the other cashier. Ms. Niles walked to Ms. Tassen's register to find out what Ms. Tassen needed and Dana, while holding the gun, told the women to take the money out of the register. Shortly thereafter, Ms. Kathleen Augustine, the manager of the restaurant, approached the register and was told to take the money out of the register. Ms. Augustine told Dana to open the drawer himself. Dana then jumped over the counter and pointed the gun at Ms. Niles, who then opened both registers at the front counter. Dana took the money and then jumped back over the counter and fled on a bicycle. A surveillance camera recorded the entire incident. The police responded and began an investigation. Investigator David Swinson was assigned to the case. However, the police were unable to make an arrest in the case.

In April 2001, Investigator Swinson went to the apartment of Dana's mother with a search warrant based on an unrelated incident, a pocketbook snatch, allegedly committed by Dana's brother, Dale Bruce, which had occurred in the 600 block of Florida Avenue, N.W. When Swinson arrived at the home, he encountered Dana and recognized him from the surveillance camera's video as the person who robbed the Popeye's restaurant. Dana was arrested and identified as the perpetrator. Ms. Niles identified Dana as the robber during a July 2001 line-up. However, when Ms. Augustine viewed the line-up, she had more difficulty identifying Dana as the robber. Ms. Augustine asked whether Dana could put on glasses. When she was told no, she stated that "the only person I'm only seeing, it looks like, is number 4 [Dana]." Ms. Augustine subsequently picked Dana from a photo array. Both Ms. Augustine and Ms. Niles also made in-court identifications and Ms. Niles testified that she had seen Dana in the restaurant a few weeks prior to the robbery. At that time, he entered the store and left a few minutes later without purchasing anything. During the trial, Martha Dorsey, Dana's mother, was called to the stand. While testifying, she was shown still pictures taken from the video surveillance camera. When asked to identify the person in the picture, the assailant, she stated that it "looks like Dana." Ms. Dorsey also stated that her sons look alike and are roughly the same weight and height and that both sometimes wear glasses.

Dana had planned to launch a mistaken identity defense and/or third-party perpetrator defense during trial through cross-examination of the government's witnesses. Dana contended that if permitted, he would be able to show: 1) Dana's brother, Dale, strongly resembled him; 2) Dale was the subject of the robbery search war-

---

**1.** Dana Bruce, the appellant, and his brother Dale Bruce will be identified by their first names throughout the opinion to avoid confusion.

rant executed at the home Dana shared with their mother; 3) Dale had a robbery conviction; 4) Dale was not incarcerated at the time of the Popeye's robbery; and 5) Dale spent time at their mother's home near the Popeye's restaurant. The trial court concluded that the proffer was not sufficient to create a reasonable probability that Dale, rather than Dana, committed the armed robbery at the restaurant and noting that the probative value of the evidence was outweighed by the prejudice to the government. The court noted, however, that the defense could use the similarity in appearance between Dale and Dana to show how people who look alike could be mistaken for one another. Dana now appeals this ruling arguing that the evidence should have been admitted under either *Drew v. United States*, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964) as reverse *Drew* evidence or *Winfield v. United States*, 676 A.2d 1 (D.C.1996) (en banc) (*Winfield II*).

## II.

■ "The Sixth Amendment guarantees to criminal defendants not only the right to confront and cross-examine witnesses against them, but also 'the right to present evidence that someone else committed the offense for which [he] is on trial.'" *Boykin v. United States*, 738 A.2d 768, 773 (D.C.1999) (citations omitted). However, "[a] defendant's right to pursue a particular line of cross-examination is circumscribed by general principles of relevance." *Id.* (citation omitted). A trial court's ruling on whether certain evidence is relevant or probative "is a highly discretionary decision which will be upset on appeal only upon a showing of [abuse of discretion]." *Gethers v. United States*, 684 A.2d 1266, 1271 (D.C.1996) (quoting *Mitchell v. United States*, 408 A.2d 1213, 1215 (D.C.1979)).

■ *Winfield* evidence has been described as a species or subset of reverse *Drew* evidence. *Newman v. United States*, 705 A.2d 246, 253–54 (D.C.1997) (*Newman I*). Reverse *Drew* evidence is "evidence of a recent, similar crime with a distinct modus operandi—which the defendant could be shown not to have committed" and is "admissible as tending to prove that someone other than the defendant committed the crime charged." *Id.* at 253. *Winfield* evidence, while similar, "tends to show that someone other than the defendant was the real culprit. . . . *Winfield* evidence may, but does not necessarily, reflect that someone other than the defendant had committed another crime like the one before the court; but even when a prior crime is not involved, the evidence can still be admissible because the proffered motive and opportunity to commit the crime are probative of criminality in the way that *Drew* or 'reverse' *Drew* evidence is probative." *Newman*, 705 A.2d at 254.

■ In *Winfield*, this court clarified the legal "standard[s] governing the admissibility of evidence proffered by a criminal defendant that another person or persons committed the crime alleged." *Winfield*, 676 A.2d at 2. For such evidence to be admissible,

> there must be "proof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense." The "focus" of the standard is not on the third party's guilt or innocence, but on "the effect the evidence has upon the defendant's culpability," and in this regard it "need only *tend* to create a reasonable doubt that the defendant committed the offense."

*Winfield*, 676 A.2d at 4 (citing *Johnson v. United States*, 552 A.2d 513, 516 (D.C. 1989) (emphasis in original)). *Accord,*

*Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977). This "standard insures the exclusion of evidence that 'is too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt.'" *Winfield,* 676 A.2d at 5 (citing *Johnson,* 552 A.2d at 516). Thus, a trial judge may "exclude evidence of third-party motivation[s] unattended by proof that the party had the practical opportunity to commit the crime, including at least inferential knowledge of the victim's whereabouts." *Id.; see also Hager v. United States,* 791 A.2d 911, 913 (D.C. 2002) (noting that "[d]espite this minimal inclusive relevance standard, the trial court should still exclude evidence that is too speculative with respect to the third party's guilt"). However, "[f]or admissibility the crimes need not be identical if 'the totality of the circumstances demonstrates a reasonable probability that the same [person committed both offenses].'" *Newman I,* 705 A.2d at 257 (quoting *Cox v. United States,* 498 A.2d 231, 238 (D.C. 1985)). Close questions of admissibility should be resolved in favor of inclusion, not exclusion. *Winfield,* 676 A.2d at 6–7.

"[T]he determination that evidence is relevant does not exhaust the trial judge's responsibility in deciding whether to admit it. The judge must also balance the probative value of the evidence 'against the risk of prejudicial impact.' ... [and] the trial judge will have discretion to exclude marginally relevant evidence creating the danger that proof of prior dealings or hostility between the victim and third persons will distract the jury...." *Id.* at 5. However, "that concern is subordinate to the defendant's constitutional right to mount a complete defense, including misidentification." *Battle v. United States,* 754 A.2d 312, 318 (D.C.2000). Based on this standard, our inquiry is strongly rooted in the facts of each individual case, thus

it will be helpful to review some of our recent cases that have addressed the *Winfield* standard.

In *Battle,* the appellant, Shannon Battle, was convicted of the shooting death of Ronald Thomas. As part of his third-party perpetrator defense, Battle proffered that 1) a non-fatal shooting occurred only two weeks before the charged crime; 2) the two crimes occurred within a few blocks of each other; 3) the same gun was used in both crimes; and 4) the defendant had been picked out of a photo array as the assailant in the prior shooting, but it appeared that he was incarcerated at the time of the shooting. *Id.* at 315, 317–18. We concluded that such evidence was sufficient under the *Winfield* standard to create a reasonable possibility that a third person committed the charged offense. In *Newman v. United States,* 810 A.2d 918 (D.C.2000) (*Newman II*), Michael Newman and Delonte Samuels were convicted of the murder of Rudy Williams in a sex-for-money meeting. Samuels alleged that a third person murdered Williams and proffered evidence that Theresa Hungerford, a key government witness and accomplice to the murder, committed a similar crime along with two male accomplices within two weeks of the charged crime. The evidence would also show that Samuels did not participate in the earlier crime. We concluded that although the crimes were not exactly the same, the evidence was sufficient under *Winfield* because of the similar and fairly unusual modus operandi and the fact that there was an acknowledged perpetrator who committed both crimes with accomplices. *Id.* at 922–23.

In a number of cases, we have determined that the relevance standard in *Winfield* was not satisfied. In *Gethers v. United States,* 684 A.2d 1266 (D.C.1996), we concluded that a proffer that a shooting victim was an alleged drug dealer and had

many enemies who could have committed the murder was insufficient for a third-party perpetrator defense under *Winfield* because the defendant made "no showing or proffer that such a person, if he or she actually existed, was connected in any way to the shooting." *Id.* at 1272; *see also Resper v. United States*, 793 A.2d 450, 460 (D.C.2002) (quoting *Winfield v. United States*, 652 A.2d 608, 612 (D.C.1994) (*Winfield I*)) (" '[A] defendant's proffer of evidence that other individuals had even stronger motives to murder the victim than the accused [is] insufficient, *without more*, to establish the [required] link to the offense charged.' " (emphasis added)). In *Wilson v. United States*, 711 A.2d 75 (D.C.1998), we held that evidence of another murder committed three days prior to the charged murder should be excluded under *Winfield* because the murders were committed in different locations, with different weapons, and in completely different manners. Further, no evidence or testimony linked the murders to one another. *Id.* at 77–78. Finally, in *Hager*, the defendant alleged that one of two other named persons present at the crime scene may have committed the murder. To support his argument, the defendant proffered that two others were present at the time of the shooting and that there was an alleged shoot-out between one or both of the two others and the victim. We concluded, however, that "in the end [the proffer was still] far too speculative to support a *Winfield* argument." 791 A.2d at 913.

In this case, Dana proffered the following to support his third-party perpetrator defense: 1) Dana's brother, Dale, strongly resembled him; 2) Dale was the subject of a search warrant for a robbery that had taken place in the 600 block of Florida Avenue, N.W.; executed at the home Dana shared with their mother; 3) Dale had a robbery conviction; 4) Dale was not incarcerated at the time of the Popeye's robbery; and 5) Dale spent time at their mother's home near the Popeye's restaurant and had access to a bicycle.[2]

Dana first argues that Dale's robbery charges and convictions should be admitted as other crime's evidence under a reverse *Drew* analysis. We disagree. As the trial court accurately concluded, there was no distinct modus operandi between the robbery Dana was accused of and Dale's purse snatching conviction. The robberies are so different in kind, that there is no reasonable possibility that because Dale was convicted of purse snatching, he also committed the armed robbery. The robbery at the Popeye's restaurant was committed with a gun, and appeared to be planned in advance. By contrast, the other robbery was a pocketbook snatch and there is no evidence that it was in any way similar to the Popeye's robbery. *See generally Wilson*, 711 A.2d at 78.

Admissibility under the *Winfield* standard, however, is broader, and we must look at the totality of the circumstances to determine whether there was sufficient evidence to satisfy the *Winfield* relevancy standard. The trial court's analysis demonstrated a thorough evaluation of the defendant's proffer and a thoughtful application of our *Winfield* standard. After reviewing the proffer, and the trial court's analysis, we cannot say that the trial court abused its discretion in concluding that the probative value of the evidence was substantially outweighed by the prejudice to the government. We will look first at each proffered fact individually, and then assess the relevance of

---

**2.** It appears that Dana did not proffer that Dale had access to the bicycle, nevertheless we will include the fact in our analysis.

them as a whole. First, while there is testimony that Dana and his brother look alike (similar height, weight, glasses), there is no evidence in the record that anyone has ever confused them for one another or that Dale was in any way connected to the armed robbery. *See, e.g., Battle,* 754 A.2d at 315, 317–18. Second, as we have already stated, Dale's prior robbery for a pocketbook snatch did not raise a reasonable probability that the same person committed both crimes. For the same reasons, the fact that Dale was the subject of a search warrant for a pocketbook snatch, which was executed at the home Dana shared with his mother, is not sufficient to meet the *Winfield* bar. *See generally Wilson,* 711 A.2d at 78. And the fact that two dissimilar robberies took place in the same block over a four-month period adds nothing to the weight of Dana's showing. Finally, evidence that Dana was sometimes, albeit irregularly, at his mother's home near the Popeye's where the bicycle was stored and was not incarcerated at the time of the robbery, would not tend to indicate that Dale had the opportunity to commit the armed robbery. There was absolutely no proffer that Dale was in any way connected with the actual robbery. *Gethers,* 684 A.2d at 1266. The proffered facts individually are clearly speculative and do not satisfy *Winfield.* When the facts are viewed collectively, Dana's argument is stronger. However, they are marginally relevant, too remote in time and place, and thus far too speculative with respect to Dale's alleged guilt. The probative value of this evidence, if any, is so slight that if presented to the jury it would have required them to engage in idle speculation. Thus, we agree with the trial court that the lack of probative value of the evidence far outweighs any perceived prejudice to Dana.

For the foregoing reasons, the trial court's ruling is affirmed.

*So ordered.*

**In re J.O.R., Appellant.**