*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-CF-944

CARRINGTON WILLIAMS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CF3-14625-15)

(Hon. Zoe Bush, Trial Judge)

(Argued June 23, 2020                    Decided February 10, 2022)

*Fleming Terrell*, Public Defender Service, with whom *Samia Fam* and *Jaclyn Frankfurt*, Public Defender Service, were on the brief, for appellant.

*Daniel Lenerz*, Assistant United States Attorney, with whom *Jessie K. Liu*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *John P. Mannarino* and *David P. Saybolt*, Assistant United States Attorneys, were on the brief for appellee.

Before THOMPSON,[*] *Associate Judge*, and WASHINGTON and FISHER,[**] *Senior Judges*.

---

[*] Judge Thompson was an Associate Judge of the court at the time of argument. Although her term expired on September 4, 2021, she will continue to serve as an Associate Judge until her successor is appointed and qualifies. *See* D.C. Code § 11-1502 (2012 Repl.) She was appointed on October 4, 2021, to perform judicial duties as a Senior Judge. *See* D.C. Code § 11-1504(b)(3) (2012

(continued…)

WASHINGTON, *Senior Judge*: Appellant, Carrington Williams, was indicted on eight counts stemming from incidents that took place at his former girlfriend's apartment on the evening of September 26 and into the morning of September 27, 2015. The case first went to trial on November 15, 2016, but before the jury was sworn, one of the complainants in this case, Derrick Brown, was arrested on charges of "domestic violence" against one of the other complainants, Tonica Belton. As a result, the trial was postponed. In March 2017, appellant was convicted after a jury trial of first-degree burglary, first-degree burglary while armed, two counts of destruction of property, assault with significant bodily injury, and two counts of simple assault. In this appeal, appellant argues that the trial court erred by concluding that he could be convicted of two counts of first-degree burglary, first for entering an apartment and again for entering a bedroom within the apartment, both belonging to the same complainant; and by curtailing the defense's impeachment of Mr. Brown.[1] Concluding that the burglary statute does

---

(…continued)

Repl.). She will begin her service as a Senior Judge on a date to be determined after her successor is appointed and qualifies.

** Judge Fisher was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on August 23, 2020.

[1] Appellant appeals his convictions for one of the two counts of simple assault and for assault with significant bodily injury of Ms. Belton, arguing that the

(continued…)

not ordinarily permit multiple convictions for breaches of different portions of the same dwelling, we reverse in part. We hold that the trial court did not err in curtailing the impeachment of Mr. Brown, and thus affirm appellant's remaining convictions.

## I. THE EVIDENCE AT TRIAL

Tonica Belton testified that she is appellant's former girlfriend and the mother of appellant's children. At the time of the incidents at issue here, Ms. Belton was in a relationship with Derrick Brown, who was at her apartment. Ms. Belton lived at the apartment with her children, and was the leaseholder. No other adults lived in the apartment. On September 26, 2015, appellant and Ms. Belton became involved in a dispute via a text message exchange. Appellant then arrived at Ms. Belton's apartment and the two of them argued in person outside of her apartment complex. Ms. Belton returned to her apartment and locked her front door. Appellant texted Ms. Belton to meet him outside, but she refused to meet

---

(…continued)
convictions must merge since they both arise from the same assault inside her bedroom. The government concedes appellant's argument. Accordingly, we hold that appellant's simple assault and assault with significant bodily injury convictions merge, with the conviction for assault with significant bodily injury surviving.

him.  Soon after, appellant began kicking her apartment door and forcibly opened it; he grabbed and pushed Ms. Belton before Mr. Brown became involved in the altercation.  While the men were fighting in the kitchen, appellant grabbed a knife and ran after Mr. Brown, who exited the apartment.  Ms. Belton ran into her bedroom, where her daughter was sleeping, locked the door, and "got on the floor." She put her "back up against the corner of the bottom of the bed and used [her] feet to keep the door closed."  Appellant did not follow Mr. Brown, but instead broke Ms. Belton's bedroom door, cut her shoulder with the knife he was carrying, grabbed her hair, and repeatedly punched her.  At one point, appellant stopped and walked out of the bedroom, but then entered again and resumed hitting Ms. Belton.

During the trial, Mr. Brown testified that he had been drinking in Ms. Belton's bedroom since the morning of September 26, 2015.  He stated that he had been drinking because he was unable to see his newborn child and consequently was depressed.  Mr. Brown added that he had observed appellant choking Ms. Belton before appellant attacked him.  He testified that when he was fighting with appellant in the kitchen, appellant had grabbed a knife and swung it at him, cutting his shirt but not wounding him.  During cross-examination, Mr. Brown admitted to bragging about his fight with appellant on social media.  Mr. Brown also confirmed that when he testified before the grand jury in this case, he had a

pending misdemeanor assault case for an incident arising in September 2015, and he eventually pled guilty to the charge. He testified that the charge carried up to six months in jail. Mr. Brown was impeached with his grand jury testimony in which he stated that he had started drinking in the afternoon, and that in fact he had seen his newborn child the night before. During further cross-examination, he stated that he was "upset" and "depressed" but again asserted that it was because he "couldn't see [his] child." Mr. Brown denied being angry with appellant or attacking him with a knife. Mr. Brown was also impeached with his November 2016 charge for destroying Ms. Belton's property, and testified that the government had dropped those charges against him. He confirmed that the day before he destroyed Ms. Belton's property, Ms. Belton informed him that she had talked to the defense team in this case, but he denied threatening Ms. Belton or calling her a "snitch."

During the trial, the defense sought to introduce specific facts of Mr. Brown's September 2015 assault (which resulted in a conviction), arguing that the facts of the assault were necessary for the jury to assess "whether . . . the witness [Brown] might be biased[.]" The defense counsel conveyed to the trial court that the September 2015 assault charge resulted from Mr. Brown slapping his girlfriend, Lauren Hickson ("Hickson assault"), who had just given birth to their

newborn child. The defense theory was that Mr. Brown had "an independent self-interest in avoiding prosecution . . . [and] a motive to curry favor with the [g]overnment . . . [as well as] a separate . . . area of bias." It was also asserted that "Mr. Brown [was] the person who assaulted Ms. Belton, not [appellant]." As to the bias issue, the defense argued that when Mr. Brown testified before the grand jury, "he was . . . wrapped up in a possible domestic violence love triangle kind of case having his own pending DV case."

The trial court ruled that the defense could inquire about Mr. Brown's probation resulting from his guilty plea, and about how he could face 60 days of incarceration if he were to violate the probation. The court also permitted the defense to ask questions related to Mr. Brown's potential belief that "he should curry favor with the government in the event that he did violate his probation[.]" The court found, however, that introducing specific facts underlying the Hickson assault or other matters of domestic violence would be more prejudicial than probative.

The defense moved for a judgment of acquittal on all counts after the government rested its case. According to the defense, the government could not charge appellant with two counts of first-degree burglary for the entry into Ms.

Belton's apartment and again for the entry into her bedroom because the bedroom did not qualify as a separate dwelling or a room used as a sleeping apartment under the statute, and the charges were duplicitous.

## II. DISCUSSION

***Burglary Convictions***

We address the issue of the two burglary convictions first. The crime of burglary is defined in relevant part as:

> Whoever shall . . . break and enter, or enter without breaking, any dwelling, or room used as a sleeping apartment in any building, with intent to . . . commit any criminal offense, shall, if any person is in any part of such dwelling or sleeping apartment at the time of such breaking and entering, or entering without breaking, be guilty of burglary in the first degree.

D.C. Code § 22-801(a) (2012 Repl. & 2021 Supp.). At issue in this case is the proper unit of prosecution for burglary—specifically, whether a defendant may be convicted of burglary twice for first entering a dwelling, and then a locked bedroom within that larger dwelling that is occupied by the same individual. Appellant argues that his conviction for first-degree armed burglary of Ms. Belton's bedroom must be vacated because the phrase "room used as a sleeping

apartment" refers to rooms that can be burgled separately from the larger structure, such as a hotel room or a dormitory room. The government recommends an expansive interpretation of § 22-801(a) in which any locked bedroom inside a dwelling qualifies as a room used as a sleeping apartment. We reject the government's broad interpretation. *See Swinson v. United States*, 483 A.2d 1160, 1162 (D.C. 1984) ("The common law offense of burglary . . . has been replaced by a statutory crime. . . . The much broader definition of burglary found in [the D.C. Code] is in derogation of the common law, and the statute is therefore to be construed strictly."); *United States v. Evans*, 30 App. D.C. 58, 62 (D.C. Cir. 1907) ("Ordinarily, penal statutes in derogation of the common law are strictly construed.").

This court reviews questions of statutory interpretation *de novo*, including questions regarding the proper unit of prosecution. *Whylie v. United States*, 98 A.3d 156, 162 (D.C. 2014) (citing *Hammond v. United States*, 77 A.3d 964, 967 (D.C. 2013)). "When it becomes necessary to determine [w]hat [the legislature] has made the allowable unit of prosecution . . . under a statute which does not explicitly give the answer[,] doubt will be resolved against turning a single transaction into multiple offenses[.]" *Whylie*, 98 A.3d at 162 (internal quotation

marks omitted). In this case, the evidence was sufficient to support both convictions for burglary, but that does not mean that both convictions can stand.

We find the recent opinion in *People v. Garcia*, 365 P.3d 928 (Cal. 2016), informative in determining when multiple convictions for burglary are permitted. In *Garcia*, the Supreme Court of California analyzed whether a defendant could be convicted of a second burglary for entering into a store bathroom after breaching the security of the store upon his initial entry. The court explained that:

> a burglary does not result from every felonious entry into a room preceded by a burglary of an enclosing structure. Rather, the subsequent entry will constitute a burglary only when the invaded room provides an objectively reasonable expectation of privacy and security, distinct from that the enclosing structure itself provides, which makes the room similar in nature to [a] stand-alone structure[]. . . .

*Id.* at 932. The *Garcia* court concluded that a "'room' may be 'subsumed' into a larger structure when it is not different in nature from the enclosing structure—that is, when it provides no incremental security, privacy, or possessory right, as compared to the enclosing building." *Id.* at 932-33.

The particular facts of this case are such that Ms. Belton's bedroom was "subsumed" into the larger structure of her apartment, as the spaces were "not

different in nature"; that is, the bedroom was part of her "dwelling." Ms. Belton was the only adult leasing the apartment. There was no distinct possessory interest between her bedroom and the rest of the apartment; the entire space was her own, occupied by only herself and her children. Appellant violated Ms. Belton's possessory interest when he first entered her apartment with intent to commit an assault. When he entered her bedroom, he did not violate a separate possessory interest which could support a second conviction.[2]

We readily agree with numerous other jurisdictions that have likewise sustained multiple burglary convictions only where multiple possessory interests were violated. *See Bedard v. Nevada*, 48 P.3d 46, 48-49 (Nev. 2002) (upholding multiple counts of burglary for entering separate office suites within a single structure when each suite was rented by a different tenant); *Minnesota v. Hodges*, 386 N.W.2d 709, 711 (Minn. 1986) ("[T]he burglarious entry of one dwelling should justify only one burglary conviction. Under this approach, the commission of other crimes . . . against the occupants of the dwelling after entry is made may be additionally punished with convictions and sentences . . . per victim of the other

---

[2] The government does not argue that two burglary convictions can stand because appellant had reached a fork in the road before breaking into Ms. Belton's bedroom or acted under a fresh impulse in doing so.

crimes, but only one burglary conviction would be allowed."); *Oregon v. White*, 147 P.3d 313, 322 (Or. 2006) (holding that the defendant did not commit "'separately punishable' burglaries" when he unlawfully entered "into the victim's apartment with the intent to commit two different crimes.").

That is not to say that the burglary statute did not protect Ms. Belton's bedroom; it was, as we have said, a part of her dwelling. If appellant had lawfully been inside her apartment, and then unlawfully entered her bedroom with intent to assault her, he would have breached her possessory interest and committed a burglary. The issue here is not that there was no breach when he entered her bedroom, but rather, that there was no breach of a possessory interest distinct from that which he breached upon his initial entry into her apartment. Our conclusion does not exclude, for example, the possibility of a first-degree burglary charge for an individual who has an invitation to enter the larger structure but then enters a locked room within the same structure without the owner's or the occupant's permission with the intent to commit a crime once therein. This conclusion is also in line with the decisions of other jurisdictions. *See Sandefer v. Mississippi*, 952 So. 2d 281, 287 (Miss. Ct. App. 2007) ("[A] burglary is committed . . . by one who has permission to enter the dwelling (the outer or entrance door) of another but once inside, breaks and enters, without permission, an inner door of a room of that

dwelling with the intent to commit some crime therein."); *Wisconsin v. Curtis*, 424 N.W.2d 719, 721-22 (Wisc. Ct. App. 1988) (upholding burglary conviction where defendant lawfully resided in the house but did not have consent to enter victim's bedroom); *People v. Sparks*, 47 P.3d 289, 299 (Cal. 2002) (upholding burglary conviction where defendant was allowed into house before entering bedroom, and victim was a young adult living with her family and "reasonably could expect significant additional privacy and security" in her bedroom).

In sum, Ms. Belton's bedroom did not provide an objective expectation of privacy and security that was distinct from that associated with the rest of her apartment. It was part of her dwelling, not a separate room used as a sleeping apartment. Therefore, appellant's second conviction of first-degree burglary while armed must be vacated.

### *Curtailment of Cross-examination*

Appellant argues that the trial court violated the Sixth Amendment Confrontation Clause when it foreclosed all inquiry into the facts underlying

witness Brown's assault upon Ms. Hickson.[3]  He contends that those facts were "essential to enable jurors to evaluate the strength of Mr. Brown's motives both to curry favor with the same prosecution that was investigating and prosecuting him for a near-contemporaneous domestic violence assault, and to shift the blame for the second such assault in which he was involved . . . onto appellant."  The government counters that the court allowed ample inquiry into Mr. Brown's

---

[3]  Alternatively, appellant argues under *Winfield v. United States*, 676 A.2d 1 (D.C. 1996) (en banc), the facts of the Hickson assault were admissible to show that it was Mr. Brown who had attacked appellant and Ms. Belton on September 26, 2015.  We reject appellant's *Winfield* argument because no witness identified Mr. Brown as the assailant; Ms. Belton freely testified about Mr. Brown's aggression towards her after the incident at issue here, so appellant's argument that Ms. Belton identified appellant as the assailant to the police out of fear is unpersuasive; and Mr. Brown's mere presence and ease of access to the knife does not indicate that appellant did not commit the assault.  *See Bruce v. United States*, 820 A.2d 540, 546 (D.C. 2003) (rejecting the appellant's *Winfield* argument where the "proffered facts individually [were] clearly speculative and [did] not satisfy *Winfield*" and, when facts were examined collectively, they were only "marginally relevant").  Appellant also contends that Mr. Brown opened the door to the facts of the Hickson assault when he testified about the issue on direct examination.  We are unpersuaded by appellant's argument.  Based on the record, we cannot conclude that the trial court abused its discretion in limiting the extent of cross-examination when it permitted introduction of Mr. Brown's prior inconsistent statement — concerning the Hickson assault — to the grand jury.  *See* (*Latasha*) *Brown v. United States*, 763 A.2d 1137, 1139 (D.C. 2000) ("This court will set aside an exercise of trial court discretion 'only upon a showing of grave abuse.'") (quoting *Taylor v. United States*, 661 A.2d 636, 643 (D.C. 1995)).  Lastly, appellant claims that defense counsel should have been able to cross-examine Mr. Brown about the Hickson assault because he provided false testimony on the topic.  Appellant's argument is unavailing.  The defense was allowed to inquire specifically about Mr. Brown's false testimony on the issue of whether he was able to see his newborn child.

motives to curry favor with the government, and any further details of Mr. Brown's history of domestic violence would have inflamed the jury. Therefore, it submits, the trial court properly curtailed Mr. Brown's cross-examination.

Under the Confrontation Clause of the Sixth Amendment, a defendant has a right to cross-examine prosecution witnesses. *Coles v. United States*, 808 A.2d 485, 489 (D.C. 2002). The trial court, however, has a wide latitude to impose reasonable limits on cross-examination without violating the Confrontation Clause. *Id.* The trial judge may impose reasonable limits on cross-examination "'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Id.* (quoting *Grayton v. United States*, 745 A.2d 274, 280-81 (D.C. 2000)). "The Sixth Amendment 'guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.'" *Lewis v. United States*, 10 A.3d 646, 653 (D.C. 2010) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)) (emphasis in original).

To clarify the scope of the Sixth Amendment right to cross-examination, this court recently focused on the standard articulated by the Supreme Court in *Delaware v. Van Arsdall*, 475 U.S. 673 (1986). Under the *Van Arsdall*

formulation, "a violation of the Sixth Amendment is shown if '[a] reasonable jury might have received a significantly different impression of [the witness's] credibility had [defense] counsel been permitted to pursue [the] proposed line of cross-examination.'" *In re J.W.*, 258 A.3d 195, 202 (D.C. 2021) (quoting *Van Arsdall*, 475 U.S. at 680).

Here, the defense was precluded from inquiring about facts underlying the Hickson assault, an effort which it claimed would show: 1) that Mr. Brown gave misleading testimony about what had occurred at the hospital; 2) that the temporal proximity between his grand jury testimony in this case and the government's prosecution of him for the Hickson assault gave him a motive to curry favor with the government when testifying; and 3) his possible motive to shift blame for the assault of Ms. Belton onto appellant. However, the defense was able to elicit other impeachment evidence about Mr. Brown such as his drinking habits and his anger when drinking, his attacks on Ms. Belton and destruction of her property, and social media posts boasting of his fight with appellant. Defense counsel was also allowed to inquire into Mr. Brown's motivation to curry favor with the government – establishing that his simple assault prosecution was pending when he testified before the grand jury in this case and the possible punishment he faced for that charge. Although defense counsel was precluded from asking any questions about

the facts underpinning that charge, counsel was "permitted to present the nature and extent of the [possible] bias" by bringing to light the fact that there was a charge pending against Mr. Brown, the nature of that crime, and the potential penalty. *Longus v. United States*, 52 A.3d 836, 851 (D.C. 2012). In contrast, "violations are found primarily where defendants have been given *no* realistic opportunity to ferret out a potential source of bias[.]" *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996) (emphasis in original) (internal quotation marks omitted). *See, e.g., Davis v. Alaska*, 415 U.S. 308, 318 (1974) (Sixth Amendment violation where counsel was permitted to ask witness whether he was biased, but not to demonstrate why he might be); *Jenkins v. United States*, 617 A.2d 529, 532 (D.C. 1992) (Sixth Amendment violation where "the exact nature of the crime" was not disclosed, meaning the jury "was without knowledge if the crime committed carried a significant sentence which might induce [the witness] to shade his trial testimony to curry the government's favor in the future").

The jury also learned that Mr. Brown was on probation at the time of trial and faced sixty days in jail if he were found to have violated his probation. As conditions of probation, he was "ordered to complete an alcohol evaluation and get treatment as directed" and to "enroll in and complete [a] domestic violence intervention program." Mr. Brown acknowledged that destroying Ms. Belton's

property constituted a violation of that probation, but the government "decided to drop that violation of probation." Moreover, the government had dismissed the charges against him for destroying Ms. Belton's property. Defense counsel asked rhetorically, "the government has done pretty well by you, right[?]"; Mr. Brown responded, "[b]een blessed."

Given defense counsel's ability to impeach Mr. Brown with his prior inconsistent stories; his tumultuous history with Ms. Belton; his anger and drinking; his assault charge and the potential sentence for such; the fact that he was on probation at the time of trial; that, although the destruction of Ms. Belton's property constituted a violation of his probation, his probation was not revoked; and that the government dismissed the destruction of property charges shortly before trial, we do not find that the jury would have formed a "significantly different impression" of Mr. Brown with the additional, precluded details, and so there was no Sixth Amendment violation.

For the foregoing reasons, we affirm appellant's convictions except his first-degree burglary while armed conviction and his conviction for simple assault, which we remand for the trial court to vacate.

*So ordered.*